IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PIERRE EVANS SIMMONS,

    Petitioner,                    No. CIV S-03-1120 FCD KJM P

   vs.

D.L. RUNNELS, Warden,

    Respondent.                 FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prison inmate proceeding pro per with a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his Shasta County conviction for corporal injury on a cohabitant and his three strikes sentence of twenty-six-years-to-life. He raises the following grounds for relief: (1) the court erred in appointing attorney Stephen Carlton to represent him because Carlton had prosecuted petitioner in the past; (2) the court prevented petitioner from calling his daughter Cassandra, a "material witness," during the preliminary hearing and trial counsel had not properly investigated and so could not make an offer of proof; (3) petitioner's first defense attorney failed to investigate and prepare a defense; (4) the prosecutor presented perjured testimony; (5) trial counsel was ineffective in failing to object to the perjured testimony; (6) petitioner's rights were violated by the following actions: (a) the prosecutor presented two theories of the offense and excluded eyewitnesses, (b) the trial judge

1

prevented petitioner from presenting a defense and confronting false witnesses, and (c) the prosecutor vouched for the credibility of his witnesses during closing argument; (7) ineffective assistance of trial counsel in not securing evidence to impeach petitioner's stepson Robby, presenting evidence of a bite mark comparison, presenting information about the polygraph test, and failing to call impeaching witnesses;[1] and (8) ineffective assistance of appellate counsel.

I. Procedural And Factual Background

Petitioner was charged with inflicting corporal injury on the mother of his child, in violation of California Penal Code section 273.5, and was alleged to have suffered two prior "strikes." Petitioner's first trial ended with a hung jury, but he was convicted in a second trial and sentenced to a total term of twenty-six-years-to-life. CT 318-319 (hung jury); CT 526-531 (conviction in second trial).

The Court of Appeal's summary of the facts developed at trial is consistent with this court's reading of the record:

> On the evening of June 24, 1998, defendant attacked his wife, Pam in their mobile home. He held her down and bit her arms and abdomen. He insulted her, calling her a bitch and telling her she was lazy and a lousy mother.
>
> Pam convinced defendant she needed to use the restroom. Once in the restroom, she tried to escape through the bathroom window, but she knocked a dish off the toilet while climbing out.
>
> Defendant rushed into the bathroom, threw Pam on the floor and started stomping on her chest with his bare feet, telling her she was going to die. Defendant scratched Pam's face and threw her against the bathtub, causing a knot on the back of her head.
>
> Defendant then picked up a stick and started beating her on the buttocks. Defendant left the bathroom, then returned with a butcher knife. He forced Pam to crawl into the living room while he held her hair. He held the knife to her neck.
>
> The couple's daughter, Cassandra, who was in her room in bed, started screaming at her father. Defendant told Pam to go check on

---

[1] The claims numbered here as six and seven are all included in the petition under ground six.

Cassandra. Pam headed toward Cassandra's room, but went instead to a window, from which she escaped. She ran to the next door neighbor's trailer, and asked them to call the police. The neighbor, Sandy Fuller, went back to the Simmons' trailer to get the three children. Defendant told Mrs. Fuller to go away and mind her own business, but she persisted. When she went into the trailer, defendant got on his bicycle and left.

Pam suffered a fractured sternum, concussion, and bruises to her arms, face and buttocks.

Cassandra, who was 13 at the time of the attack, testified that her father drank beer every day, even though drinking alcohol was a parole violation. She testified her mother drank only occasionally. Cassandra testified she woke up during the evening of June 24, 1998, and heard her father's voice, which sounded low and mean. When she did not hear her mother's voice, she became concerned and screamed at least ten times to get defendant's attention. Finally, her mother came in, but went straight through the room and out the window. Defendant came into Cassandra's room and asked where Pam had gone. Cassandra asked defendant what was happening. He did not answer. He seemed angry, and left the room.

A few minutes later, Cassandra walked into the kitchen and saw a butcher knife on the counter. Their neighbor came to the door and told defendant she was there to take the kids. The neighbor and defendant yelled at each other, but the neighbor eventually got in the house.

Defendant testified he went to sleep on the couch in the living room. Pam woke him up, telling him she wanted to get some methamphetamine. This upset him, and he reached out and pushed her. He then went back to sleep. A little later, Pam woke him up again, claiming he had scratched her nose. Defendant went back to sleep. The next thing he knew, he heard someone calling and banging on the trailer next door shouting "call 911." He got up and looked out the living room window, but could not see Pam because of a tree. He then went to the girl's bedroom and looked out that window. Shortly thereafter, the next door neighbor arrived.

/////
/////
/////
/////
/////
/////

3

> The defense maintained Pam concocted the story because she wanted defendant out of her life because he was trying to prevent her from obtaining illegal drugs. The defense claimed Pam was addicted to Vicodin, which she took for migraine headaches, and that if she could not get Vicodin, she would take methamphetamine or alcohol. The defense claimed Pam suffered all her injuries by falling out of the window.

Answer, Ex. B (Court of Appeal opinion) at 2-4. The California Supreme Court denied review. Id., Ex. D (order).

Petitioner then pursued collateral relief in the state courts, raising the grounds he has presented in the instant writ. The California Supreme Court denied the petition for a writ of habeas corpus citing In re Swain, 34 Cal. 2d 300, 304 (1949), In re Duvall, 9 Cal. 4th 464, 474 (1995), and In re Dixon, 41 Cal. 2d 756 (1953). Id., Ex. E.

II. Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA"). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

/////

---

[2] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

5

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III. Procedural Default

Respondent argues that the California Supreme Court's order denying petitioner's state writ imposes a procedural bar to this court's consideration of petitioner's claims. Answer at 9-12. Respondent's argument is not well taken.

In Coleman v. Thompson, 501 U.S. 722 (1991), the U.S. Supreme Court held that federal courts should not review an alleged violation of federal law on habeas review if the state court's decision rests on an independent and adequate state ground.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750.

/////

In addition to the requirement that the state procedural rule be "adequate and independent," the rule must also be actually relied on in the particular case in question. Id. at 735. "[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review." Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir. 1996) (reciting rule announced in Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994)).

In this case, the California Supreme Court cited three cases in denying petitioner's state habeas petition. The last case cited, In re Dixon, 41 Cal. 2d 756 (1953), established the rule that a habeas petition cannot be used as a substitute for direct appeal: if the issue could have been raised on direct appeal but was not, a defendant may not raise the issue in a habeas petition. See generally Park v. California, 202 F.3d 1146 (9th Cir. 2000) (discussing Dixon rule).

The California Supreme Court cited two other cases, In re Swain, 34 Cal.2d 300, 304 (1949) and In re Duvall, 9 Cal.4th 464, 474. The Ninth Circuit has interpreted a Swain/Duvall citation to mean that a defendant has failed to exhaust state remedies, because the defendant is being given an opportunity to amend his pleadings to "allege with sufficient particularity the facts warranting habeas relief." King v. Roe, 340 F.3d 821, 823 (9th Cir. 2003).

Although the state Supreme Court suggested two different reasons why petitioner's state collateral attack was denied, it did not specify which claims were denied for failure to allege the grounds for relief with sufficient particularity or which were barred because they could have been, but were not, raised on direct appeal. This ambiguous order does not provide the proper foundation for the procedural bar that respondent asks this court to apply. Calderon v. U.S. Dist. Court for Eastern Dist. of California, 96 F.3d 1126, 1131 (9th Cir. 1996).

Petitioner's failure to exhaust his state remedies, at least as to some of his claims, poses a different question for this court. Although respondent has not fully addressed the impact of the Swain/Duvall citation on the posture of this case, this court can no longer find that respondent has waived exhaustion based on litigation conduct. Banks v. Dretke, 540 U.S. 668,

7

674 (2004); 28 U.S.C. § 2254(b)(3).  Nevertheless, the court may address petitioner's claims "when it is perfectly clear that the petitioner has no chance of obtaining relief."  Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir.), petition for cert. filed, 74 U.S.L.W. 3352 (U.S. Nov. 1, 2005) (No. 05-723).  After considering the petition and its exhibits, the answer, reply and state court record, the court finds the Cassett standard has been satisfied, and thus addresses all of petitioner's claims below.

IV.  Attorney Carlton's Conflict Of Interest (Ground One)

Petitioner argues his Sixth Amendment rights were violated by the appointment of Stephen Carlton to represent him because Carlton was the district attorney of Shasta County when petitioner's offenses were charged as strikes in the instant prosecution, creating a conflict of interest.  Amended Petition (Pet.) at 4 & Ex. A-3[3] (Information in People v. Simmons, No. 79494).  In a portion of his traverse that is difficult to understand, petitioner argues that this conflict of interest propelled Carlton to attempt to interview Pamela's son Robby over petitioner's objection.  Traverse at 15.  In the sealed transcript lodged with this court of one of the Marsden[4] hearings in petitioner's trial, petitioner suggests it was Carlton's attempts to interview Robby that prompted Pamela to "come up with" Robby's claim that he indeed saw petitioner attack Pamela.  RT 36.

The right to counsel guaranteed by the Sixth Amendment is the right to representation that is free from conflicts of interest and the assistance of counsel whose loyalties are not divided.  Wood v. Georgia, 450 U.S. 261, 271-72 (1981).  To obtain relief under the Sixth Amendment, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance" at trial but also during pretrial proceedings and preparation.  Cuyler v.

---

[3] The exhibits referenced herein were filed with the original petition; given their relevance to the claims in the amended petition, the court treats them as incorporated in the amended petition.

[4] People v. Marsden, 2 Cal. 3d 118 (1970).

Sullivan, 446 U.S. 335, 348 (1980). Petitioner must demonstrate the conflict by "a factual showing on the record"; the court must examine the record "to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." Sanders v. Ratelle, 21 F.3d 1446, 1452 (9th Cir. 1994). A defendant who makes this showing need not show prejudice to the outcome of the trial. Cuyler, 446 U.S. at 349-50.

In this case, petitioner argues that Carlton's position as district attorney of Shasta County in 1984, when petitioner was prosecuted for the offenses that were alleged as strikes in the current prosecution, created a conflict with his role as petitioner's public defender. CT 139-141 (second amended information listing strikes from case 79494); Pet., Ex. A-3 (Shasta County Information No. 79494).

In United States v. Ziegenhagen, 890 F.2d 937 (7th Cir. 1989), defendant challenged his conviction on the ground that his appointed counsel had been the deputy district attorney who, twenty years earlier, had appeared at defendant's sentencing on an offense that was alleged in the instant prosecution as a prior conviction for purposes of the increased sentencing procedures of 18 U.S.C. § 924 (e)(1). Id. at 938-39. The court held:

> In this case, the prosecutorial role that Ziegenhagen's counsel took in the earlier convictions was substantial enough to represent an actual conflict of interest. Although he was not the prosecuting attorney of record, he appeared at the sentencing hearing to recommend the length of sentence in the convictions for burglary and robbery, the convictions used to enhance Ziegenhagen's present sentence.

Id. at 940. The court concluded that defense counsel may have "decide[d] his defense strategy either at sentencing or on appeal on the basis of the conflict." Id.

The Ninth Circuit has rejected Ziegenhagen's categorical approach. In Maiden v. Bunnell, 35 F.3d 477 (9th Cir. 1994), the habeas petitioner challenged his conviction on the ground that his appointed defense counsel not only had been a prosecutor but had prosecuted

/////

/////

9

petitioner three years earlier in a burglary case. The Ninth Circuit noted:

> Although the possibilities for actual conflicts are very real when attorneys "switch sides" in a subsequent criminal case involving the same defendant, such conflicts do not automatically occur. Determining whether an attorney has an actual conflict involves a closer examination of the facts of each particular case, with a particular eye to whether the attorney will, in the present case, be required to undermine, criticize, or attack his or her own work product from the previous case.

Id. at 480-81. The court in Maiden did not find counsel's prior prosecutorial role to constitute a conflict, because there was no suggestion that the cases were substantially related or counsel divided his loyalties between his former and current roles. Id. It also found petitioner had not demonstrated any effect on counsel's handling of the case. Id. at 482.

In this case, the prior convictions and the underlying prosecutions were related because the priors were charged as "strikes." However, it is not clear whether an attack on the priors would have been an attack on Carlton's own work product.

In Hernandez v. Johnson, 108 F.3d 554 (5th Cir. 1997), the petitioner alleged that Borchers, his defense counsel, had been the elected district attorney during the time petitioner was prosecuted on an aggravated assault and a murder, both of which were pleaded in the underlying indictment and used during the penalty phase of this death penalty prosecution. Id. at 558-59. The evidence indicated that Borchers had signed a request for a psychiatric evaluation and a motion to dismiss a related indictment after a plea, undertaken based on a plea bargain he had approved. Id.

The Fifth Circuit in Hernandez found these circumstances insufficient to show that Borchers had actively represented conflicting interests because his participation in the prior prosecutions was not personal or substantial. Id. at 560. It also found petitioner had failed to show that any conflict had affected Borchers' performance at trial, because petitioner had not provided "any evidence . . . that there was a viable basis upon which the prior convictions could be attacked." Id. at 561.

Like the petitioner in Hernandez, petitioner here has presented no evidence that Carlton was personally and substantially involved in prosecuting petitioner on the earlier charges pleaded and proven as strikes in the underlying case. Moreover, he cannot show any adverse impact on Carlton's performance: Carlton was relieved as counsel on February 2, 1999, after a Marsden hearing. CT 85. The conflict public defender's office was appointed that day, but then private counsel Robert Maloney was appointed within a week, on February 9, 1999. CT 85, 86. The case did not go to trial until June 29, 1999. CT 381. If there was any dereliction on Carlton's part, it could have been and presumably was cured by successor counsel, who actually tried the case. But Maloney did not challenge the prior convictions and petitioner has presented nothing showing that such a challenge was available. Thus, he cannot prevail on this claim.

V. <u>Failure To Call Cassandra As A Witness During The Preliminary Hearing (Ground Two)</u>

In the heading to this argument, petitioner faults the prosecution for failing to disclose a material witness. In the "supporting facts" area, however, petitioner argues that defense counsel should have called his daughter Cassandra as a defense witness "to lock down Cassandras [sic] testimony at the preliminary hearing because Simmons knew that Pam was lying and Simmons believed it was just a matter of time before Cassandra changed her story . . . ." Pet. at 6. He suggests that because Pam testified that the children were asleep during the incident, Cassandra would have testified that she knew nothing of what happened to Pam. Moreover, he suggests that Cassandra would have testified (as she allegedly told a cousin) that Pam asked Cassandra to lie and say that she had seen petitioner with a knife to Pam's throat. Pet. at 5.

Although there is no constitutional right to a preliminary hearing, Howard v. Cupp, 747 F.2d 510 (9th Cir. 1984), when the state provides such a hearing, it is a critical stage of the criminal proceedings to which the Sixth Amendment right to counsel attaches. Coleman v. Alabama, 399 U.S. 1, 9 (1970). The right to counsel is, of course, the right to the effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).

11

The federal law on claims of attorney ineffectiveness is clear:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. Certainly, one of counsel's duties is investigation, but "the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed," and ineffective assistance claims "must be considered in light of the strength of the government's case." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001), as amended, 253 F.3d 1150 (9th Cir. 2001) (internal quotations, citations omitted). Petitioner cannot bear his burden of showing ineffective assistance of counsel by presenting "mere conclusory statements," United States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984), but rather must tender affidavits from the witnesses counsel neglected to interview or call, showing the "helpful testimony for the defense" they could have presented. Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); Bragg, 242 F.3d at 1088.

It also is petitioner's burden to establish prejudice: "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. This evaluation must be based on the totality of the evidence before the jury, recognizing the probability of a different outcome is less likely in a case "with overwhelming record support." Id. at 695, 696. Moreover, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697.

Petitioner has presented nothing but his own hearsay reports of what Cassandra would have said had she been called to the stand during the preliminary hearing. Indeed, her trial

testimony was largely consonant with petitioner's prediction of what she would have said at the preliminary hearing: She did not report seeing any of the abuse petitioner inflicted on his wife, but was awakened by her father's voice and called out to him. RT 355-356.  What petitioner apparently sought to preserve by Cassandra's testimony at the preliminary hearing was the account of Pam's asking Cassandra to lie about petitioner's actions.  He has not, however, borne his burden of showing that Cassandra would have recounted this story, for he has not supported his claim with a declaration from Cassandra or even from his niece Andrina, to whom Cassandra allegedly spoke. Pet. at 5.  Accordingly, petitioner has not shown any prejudice from counsel's failure to call Cassandra as a witness during the preliminary hearing.  Habeas relief is not warranted on this claim.

VI. Attorney Carlton Failed To Investigate Or Prepare A Defense (Ground Three)

On November 3, 1998, at the first of a series of Marsden hearings, petitioner complained that although the public defender's office, of which Carlton was a member, had been appointed in September, Carlton had done nothing to investigate the case or contact his character witnesses.  11/3/98[5] RT at 3; see also Pet. at 8.

As noted above, a lawyer is obligated to undertake reasonable investigation with an eye toward preparing a defense.  In this instance, however, petitioner has not attempted to show that Carlton's alleged dereliction had any impact on the fairness of his trial.  Also as noted above, Carlton was relieved as counsel in the beginning of February and Robert Maloney took the case through petitioner's two trials.  Petitioner cannot meet his burden of showing prejudice on this claim.  Strickland, 466 U.S. at 694.

VII. The Prosecutor Presented False Witnesses (Grounds Four And Five)

Petitioner argues that the prosecutor brought forth "two false witnesses" with "no prior motions by the state to withhold material and adverse witnesses testimony confidential."

---

[5] The cover sheet of this transcript includes a typographical error such that the year is identified incorrectly as 1999 instead of 1998.

1  Pet. at 9. A slightly clearer picture emerges from a reading of the transcript of the Marsden
2  hearing on February 1, 1999: "the false witnesses" appear to be petitioner's stepson Robby and
3  daughter Cassandra. 2/1/99 RT 36-37. He also argues that Maloney, his attorney at trial, failed
4  to object to the false testimony procured by the state. 3/22/99 RT 87-91 (Marsden hearing).

A conviction violates the Fourteenth Amendment if it is obtained by the use of perjured testimony the prosecutor knows to be false. Napue v. Illinois, 360 U.S. 264 (1959). It is petitioner's burden, however, to demonstrate that the challenged testimony was false, that the false testimony was material, and that the prosecutor knew the testimony was false when it was presented. Chambers v. Johnson, 218 F.3d 360, 363-64 (5th Cir. 2000). Petitioner has presented nothing but his own evaluation of the testimony to suggest it was perjured. This is not sufficient to demonstrate prosecutorial misconduct. See Carothers v. Rhay, 594 F.2d 225, 229 (9th Cir. 1979). Moreover, because he has submitted nothing but his own speculation about the testimony, petitioner cannot establish his attorneys' ineffectiveness for failing to object. Ward v. Whitley, 21 F.3d 1355, 1362 (5th Cir. 1994).

VIII. Petitioner Did Not Receive A Fair Trial (Ground Six)[6]

Petitioner argues he did not receive a fair trial because the prosecutor presented two theories of the offense, he was not allowed to confront false witnesses and present a defense, and the prosecutor vouched for his witnesses in closing argument.

A.  Two Theories Of The Offense

Although the basis of this argument is difficult to discern, it appears petitioner is arguing that Pam's testimony was contradicted by that of her son Robby, who testified in the first, but not the second, trial.

Petitioner has provided a copy of Robby's testimony from the first trial as Exhibit B-7-5. Robby testified that he was awakened by the sound of his mother and stepfather arguing.

---

[6] The ineffective assistance aspect of ground six is addressed below. See pages 18-19 infra.

14

He could see his mother hit her head on the bathtub and then petitioner hitting her with a curtain rod. Pet., Ex. B-7-5 at 5-6, 16, 21. He did not hear water running in the bathtub and thought his mother was wearing pajamas or sweatpants. Id. at 29, 32, 37.

Pam's testimony was not significantly different than Robby's. She testified that after the children had gone to bed and the neighbor Sandy Fuller had left, petitioner pushed her onto the love seat, insulted her and bit her on her abdomen and arms. RT 211-212. When she attempted to escape through the bathroom window, petitioner scratched her and pushed her against the edge of the tub. RT 220, 222, 223. She turned the water on in the bathtub, planning to wash the blood off her face. RT 222-223. It was then that petitioner told her to remove her pants and began hitting her with something like a curtain rod or the molding from around the window. RT 223-224.

While there are differences in the accounts, the core of each is the same: petitioner knocked Pam into the bathtub and hit her with some sort of thin implement. The prosecution did not present differing theories in violation of petitioner's right to due process of law. Compare Shaw v. Terhune, 380 F.3d 473, 479 (9th Cir. 2004).

Under this same heading, petitioner also faults counsel for failing to impeach Cassandra with her testimony from the first trial, a copy of which he has attached as Ex. B-7-8. The court has compared Cassandra's two accounts and finds no significant differences. Compare Pet., Ex. B-7-8 at 4-5 (she was awakened by her father's low, angry voice) with RT 355 (she was awakened by her father's low, mean voice); Pet., Ex. B-7-8 at 7-8 (after Cassandra yelled "Dad," her mother came into the room, said nothing, and went out the window) with RT 356-358 (she screamed "Dad," her mom came into the room, said nothing, and moved quickly to the window); and Pet., Ex. B-7-8 at 12-13 (she saw her mom at Sandy Fuller's house; her mom's lip was bleeding and she had marks on her arms and legs) with RT 370 (when Cassandra saw her mom at Fuller's house, she noticed blood on her mom's face and marks on her arms). While counsel has an obligation to develop lines of impeachment to be used against the prosecution's witness,

1  petitioner does not suggest nor can the court discern how Cassandra's testimony could have been
2  impeached with her answers from the first trial. Tucker v. Ozmint, 350 F.3d 433, 444-45 (4th
3  Cir. 2003), cert denied, 541 U.S. 1032 (2004). Petitioner has not borne his "heavy burden" of
4  showing counsel's performance was unreasonable. Murtishaw v. Woodford, 255 F.3d 926, 939
5  (9th Cir. 2001).

6      B.  Failure To Allow Petitioner To Confront False Witnesses And Present A Defense

7  Once again, the exact nature of this aspect of claim six is difficult to discern, but
8  petitioner appears to be arguing that he should have been allowed to call Robby as a witness in
9  the second trial and then been able to impeach him. Pet. at 19; see also Pet., Ex. B-10
10 (investigator's memo recounting conversation with Robby's former teacher, who characterized
11 him as having a problem with honesty).

12 Before attorney Maloney called petitioner to the stand, he informed the court that
13 petitioner "has something that he wanted to say that he didn't want to be stopped from saying."
14 RT 640. Petitioner said he wanted to tell the jury that it had not heard "eye witness testimony of
15 [Robby] Simmons," which had changed to "discredit Mr. Buggar[7] . . . because of Mr. Buggar's
16 testimony being brought forward as a witness in my defense against his mother." RT 642, 643.

17 The court told petitioner he could not make any statement about whether Robby
18 had testified or would testify and ordered him not to volunteer any information about the subject.
19 The court warned petitioner if he violated this order, the court would take appropriate action,
20 which might encompass excluding petitioner from trial. RT 643-644.

21 Despite petitioner's characterization, petitioner's claim of error is not based on the
22 confrontation clause but on the trial court's determination that petitioner's proposed testimony
23 was not admissible. A state court's evidentiary ruling is not subject to federal habeas review

---

[7] Although he refused to say why Pam and petitioner visited him, Brian Buggar testified
that the couple came to his house together before petitioner's arrest and Pam came by herself
after the arrest. RT 836, 837. Investigator Jim Gilhula testified he had interviewed Buggar, who
told him Pam's visits were to obtain methamphetamine. RT 866.

16

unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

Evidence that a witness influenced another to testify falsely may be admissible to demonstrate the first witness's bias. See Walters v. McCormick, 122 F.3d 1172, 1177 (9th Cir. 1997). Petitioner presents nothing substantiating his claims that Robby's testimony in the first trial was false or that Pam had persuaded her son to testify falsely. Accordingly, the trial court's determination to prevent petitioner's testimony about his beliefs did not infringe petitioner's rights or otherwise deny him a fair trial. See United States v. Polizzi, 801 F.2d 1543, 1549-50 (9th Cir. 1986) (to support a claim for relief based on the use of perjured testimony, petitioner must show what the statements were and that the prosecution knowingly used the perjured testimony). He has not borne his burden of showing error here.

Moreover, to the extent petitioner is suggesting his desire to call Robby as a witness was in conflict with Maloney's trial strategy, the claim nevertheless fails: "[T]he client must accept the consequences of the lawyer's decision . . . to decide not to put certain witnesses on the stand. . . ." Taylor v. Illinois, 484 U.S. 400, 418 (1988) ; see Jones v. Barnes, 463 U.S. 745, 751 (1983).

C. Vouching During Closing Argument

On rebuttal, the prosecutor argued:

> On to say that is suggestable [detestable?][8] to insinuate that somehow Pamela Simmons has told her daughter what, to come in here and say that. Rather pathetic if that's all he has for a defense. You should wonder about that. There is absolutely nothing, no evidence to even suggest that someone told Cassandra what to say.

/////

---

[8] The transcript suffers from many improperly transcribed words, here and in other places as well. See e.g., RT 1036, line 25 ("degree" instead of "debris").

17

> If Pamela Simmons was trying to suggest things and get her
> daughter to come in here and bolster her version of events, why not
> juice it up a little bit. Why doesn't she ask Cassandra to come in
> here and say she was sitting on the couch during this entire
> altercation, she saw everything that happened. First of all, that
> would be illegal. But beyond that, there is just absolutely nothing
> that you can put your finger on that says that Cassandra Simmons
> was in any way suggested to do anything. She came in here and
> told you the truth. And she only saw a little part of it. She only
> heard a portion of it. But that bolster's Pamela's claims.

RT 1037.

In general, a prosecutor's actions will not be grounds for habeas relief unless they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 180 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).

> Vouching consists of placing the prestige of the government
> behind a witness through personal assurances of the witness's
> veracity, or suggesting that information not presented to the jury
> supports the witness's testimony.

United States v. Necoechea, 986 F.2d 1273, 1279 (9th Cir. 1993). In United States v. Wilkerson, 411 F.3d 1, 8 (1st Cir. 2005), the Court of Appeal found no vouching when the prosecutor argued that if the officers had wanted to lie, they would have embellished their stories. As in Wilkerson, there was no vouching in this case.

IX. Ineffective Assistance Of Trial Counsel (Part of Ground Six)

Petitioner claims trial counsel Maloney was ineffective in failing to impeach Robby's testimony by showing that his second grade teacher believed he was a liar, failing to offer evidence showing that there were no bite marks in the pictures of Pamela's injuries, and in failing to seek admission of the results of petitioner's polygraph test. Pet. at 21.

As noted above, Robby did not testify in the second trial, so there was nothing for Maloney to impeach. This cannot constitute ineffective assistance of counsel.

Petitioner has attached a copy of a Forensic Dental Report from Dr. William Farrell, D.D.S., in which Dr. Farrell concludes that because of the poor quality of the

photographs submitted to him, he could not determine whether the marks were bite marks. Pet., Ex. B-11.

The jurors heard testimony from emergency room physician Robert Duvoisin, who treated Pamela after the assault. He testified that while Pamela was bruised, her skin was not broken as it would be had she been bitten. RT 271, 277-278. Dr. Farrell's conclusion, based on his review of out-of-focus pictures, would have added nothing to the information presented to the jurors. Maloney's decision not to offer the report of Dr. Farrell's testimony was not unreasonable.

Finally, the results of polygraph tests are not admissible in California. Cal. Evid. Code § 351.1. Maloney's failure to seek to admit this information does not constitute ineffective assistance of counsel. Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (failure to raise a meritless argument does not constitute ineffective assistance of counsel).

Thus, no aspect of ground six provides a basis for habeas relief.

X. Ineffective Assistance Of Appellate Counsel (Ground Seven)

Petitioner argues appellate counsel was ineffective for failing to include the grounds discussed above in the direct appeal from his conviction.

The Strickland standards apply to appellate counsel as well as trial counsel. Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy."). There is, of course, no obligation to raise

meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal.  Id. at 1434 n.9.

Petitioner's seventh ground, as well, is not a basis for a grant of habeas relief.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 24, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

2
simm1120.157